Gerald W. KILLIAN and Martha R. Killian, as Co–Executors of the Estate of Carolyn Matkin, Deceased, Plaintiffs–Appellees,

v.

HEALTHSOURCE PROVIDENT ADMINISTRATORS, INC., Defendant–Appellant.

No. 97–5574.

United States Court of Appeals, Sixth Circuit.

Argued April 22, 1998.

Decided June 30, 1998.

Rehearing Denied Aug. 7, 1998.

Robert E. Hoskins (argued and briefed), Foster & Foster, L.L.P., Greenville, South Carolina, Harry L. Dadds (briefed), Mathew D. Brownfield (briefed), Grant, Konvalinka & Harrison, Chattanooga, Tennessee, for Plaintiffs–Appellees.

Shelby R. Grubs (argued and briefed), William P. Eiselstein (briefed), Miller & Martin, Chattanooga, Tennessee, for Defendant–Appellant.

Before: RYAN, DAUGHTREY, and LAY,* Circuit Judges.

## OPINION

RYAN, Circuit Judge.

Carolyn Matkin brought this action to recover payment for medical benefits under a group health plan sponsored and administered by the defendant, Healthsource Provident Administrators, Inc., in accordance with the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461. Matkin alleged that Healthsource arbitrarily and capriciously determined that proposed treatment for Matkin's breast cancer was experimental or investigational rather than medically necessary, and therefore denied coverage. The district court entered judgment in favor of Matkin, and Healthsource appealed. Matkin died during the pendency of the appeal, and the executors of her estate have been substituted as party plaintiffs pursuant to Fed. R.App. P. 43(a). Since, however, the claims pertain to Matkin, the original plaintiff, we will refer to her as the plaintiff for convenience.

We conclude that the district court was correct in holding that Healthsource's refusal to consider certain information submitted by Matkin was arbitrary and capricious. We also conclude that the court erred when it simply conducted its own review based on that information. We will therefore affirm in part and reverse in part, and remand for further proceedings.

## I.

Carolyn Matkin was an employee of Healthsource, a corporation that administers insurance contracts and employee benefit plans. She was a participant in and beneficiary of the benefit plan Healthsource funded and administered for its employees.

In March 1992, Matkin was diagnosed with breast cancer. She underwent a mastectomy

---

* The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

and chemotherapy, after which her disease went into remission for more than a year. In August 1993, more cancer was discovered, for which Matkin received radiation treatment. Again, there was a period of remission. In June 1994, however, Matkin was diagnosed with the most advanced stage of breast cancer, Stage IV. Although she underwent more radiation and standard-dose chemotherapy, by September 1995, the cancer had spread to her skeletal system. Her doctors then recommended that she undergo a procedure known as high-dose chemotherapy with peripheral stem cell rescue, or HDC/PSCR, which the doctors believed represented her best chance of survival.

HDC/PSCR was described by the district court as follows:

[H]igh-dose chemotherapy is similar to standard dose chemotherapy, with the difference being that the amounts of the drugs given is several times larger in the high-dose version of the treatment. Both standard and high-dose chemotherapy involve introduction into the body of highly toxic chemicals designed to slow the growth and spread of cancerous tumors or to kill the cancer cells altogether.

A side effect of both versions of the treatment is that the toxic chemicals destroy not only the cancer cells but also those white blood cells that are responsible for the function of the immunosuppressive system. This side effect is even more marked in high-dose chemotherapy. Patients undergoing chemotherapy run the risk of being left with crippled immune systems, and thus at increased risk of serious illness from secondary infections. To guard against this possibility, HDC patients frequently undergo either autologous bone marrow transplant or, as in this case, peripheral stem cell rescue. PSCR involves the harvest of stem cells, which produce the immunosuppressive white blood cells, from the patient's own blood. These cells are then frozen. After the course of chemotherapy is complete, according to whatever protocol is deemed appropriate by the physician, the frozen stem cells are reintroduced into the patient's blood stream in the hope that they

will restimulate the patient's immune system.

Healthsource's health insurance plan provides coverage for treatment that is deemed "medically necessary," a phrase defined in the plan as follows:

**Medically Necessary and/or Medical Necessity**—Services or supplies provided by a: (1) Hospital, (2) Physician, or (3) other qualified provider ... are Medically Necessary if they are:

(1) required for the diagnosis and/or treatment of the particular condition, disease, Injury or Illness; and

(2) consistent with the symptom or diagnosis and treatment of the condition, disease, Injury, or Illness; and

(3) commonly and usually noted throughout the medical field as proper to treat the diagnosed condition, disease, Injury, or Illness; and

(4) the most fitting supply or level of service which can safely be given[.]

On October 24, 1995—dates become important, as will be seen—Dr. Paul Getaz, one of Matkin's treating physicians, wrote to Healthsource requesting a preliminary "determination of benefit" and a "pre-authorization of treatment" for Matkin, with respect to the HDC/PSCR treatment. He estimated the cost of treatment as being $70,000.

Healthsource forwarded the request and all the supporting documentation to a service called the Medical Ombudsman Program, which is an entity completely independent of and distinct from Healthsource. The Medical Ombudsman Program selected two oncologists, Dr. Emanuel Cirenza and Dr. Christopher Desch, to serve as independent reviewers of Matkin's request; Healthsource itself had no role in the selection of these reviewers. Healthsource requested that the reviewers

determine if the proposed treatment is required for the diagnosis and/or treatment, consistent with the symptom or diagnosis and treatment, commonly and usually noted throughout the medical field as proper to treat, and the most fitting supply or level of service which can safely be given

to this insured. Is it safe, effective and appropriate for this insured?

Healthsource's request simply tracked the plan language for "medically necessary."

On December 1, 1995, after receiving the reports prepared by Drs. Cirenza and Desch, Healthsource responded to Dr. Getaz's request, declining authorization for treatment. It set forth the following reasons:

1. A reviewer has stated that among patients who do not obtain a partial remission, (i.e., those patients who obtain either a minimal response, no response or progress in the midst of combination chemotherapy or multi-modality therapy), and among patients with widespread metastatic disease, (i.e., patients with greater than six metastatic foci), there has to date been no clinical investigational study which has found efficacy for the use of high dose chemotherapy with autologous stem cell rescue in regards to long-term disease-free survival or improvement in the natural history of this disease.

2. A reviewer has stated that there has been no follow up to determine whether or not Ms. Matkin has had any response to [her previous standard dose chemotherapy]. Therefore, the proposed treatment represents an aggressive form of therapy with no proven efficacy among patients who have not shown proven chemo-sensitivity to traditional agents.

3. A reviewer has stated that there is not a single report which has found efficacy regarding the use of high dose chemotherapy with autologous stem cell rescue for patients with widespread bony metastasis.

4. A reviewer has stated that whether or not the proposed treatment is better than conventional therapy is unknown. Therefore, it cannot be recommended as the most fitting level of service.

5. A reviewer has stated that because the treatment is unproven in this setting, and is still the subject of a larger randomized trial, the treatment cannot be considered "required."

The letter concluded with the caveat that any appeal must be filed within 60 days.

Matkin sent a letter on December 6, 1995, appealing the denial, and on January 4, 1996, 34 days after the denial of preauthorization, another of her physicians, Dr. Anthony Greco, filed a supporting letter and documentation on her behalf. Dr. Greco's letter responded, point by point, to each of Healthsource's reasons for the denial, disputing data and offering further information about Matkin's condition. Dr. Greco also enclosed documentation supporting some recent research. The letter concluded:

I would urge you to reconsider your situation in regard to Mrs. Matkin. I believe that you are making a major error in not allowing her coverage for such a serious illness for which there is no ample evidence to suggest that this is the best approach. In addition, I would like to assure you that we treat most of the patients as an outpatient. The costs have been substantially reduced over the past several years and ... often a negotiated cost can be worked out.

Dr. Getaz sent a letter on January 11 concurring in Dr. Greco's opinion.

On January 30, 1996, Healthsource responded, again denying the claim, but not before soliciting and receiving the opinions of Drs. Cirenza and Desch—both of whom indicated that their opinions were fundamentally unchanged. This time, Healthsource gave ten separately delineated reasons, taking issue with Matkin's doctor's assessment of her condition and of the available research. The letter did not contain any information regarding possible further appeal, nor did it, contrariwise, state that further action was foreclosed.

On February 9, 1996, Matkin's attorneys submitted on her behalf additional materials in support of her claim. These additional materials were voluminous, to say the least, and included, among other things, fifty affidavits from oncologists supporting the use of HDC for patients in Matkin's circumstances, and opining that it was the best and most effective treatment for Stage IV breast cancer.

On February 14, 1996, Timothy Bolden, in-house counsel for Healthsource, wrote to Matkin's attorneys in response to their

February 9 submission. He stated that Healthsource "is presently reviewing the voluminous information submitted with your correspondence. The material will be carefully reviewed to determine its applicability to the case of Ms. Matkin and her coverage under the Employee Benefit Plan." Five days later, however, Bolden wrote again to say that the materials would *not* be considered because they were not timely submitted:

> In reviewing the file related to the request of Ms. Matkin for High Dose Chemotherapy with peripheral stem cell rescue (HDC/SRC), it appears that she submitted her initial request for approval by correspondence dated October 24, 1995 ... Healthsource Provident Administrators, Inc .... responded by letter on December 1, 1995 ..., denying the request as stated therein. On January 11, 1996, Dr. Getaz of Response Technologies submitted correspondence to appeal the previously described claim determination. This appeal was submitted in a timely fashion under the terms of the applicable employee benefit plan. On January 30, 1996, [Healthsource] responded by letter denying the appeal for the reasons stated therein....
>
> Section III of the plan governing benefits available to employees of [Healthsource], regarding claims appeal procedures, ... is attached....
>
> *Based upon the foregoing, it appears that the administrative remedies available under the terms of the plan for appeals have been exhausted.* Accordingly, the previously stated denial of the Claims Fiduciary will not be disturbed. The materials submitted under cover of your recent correspondence have not been considered by the Claims Fiduciary and are not part of the administrative record of this claim.

(Emphasis added.)

The portion of the plan to which Bolden referred and on which he relied are the procedures for appealing an adverse decision on a *claim:*

> Payment of claims under the plan will be made ... with [sic] 90 days of written receipt of proof of loss, unless special circumstances require an extension of time

for processing the claim. If that is the case, [Healthsource] will notify you in writing before the expiration of the initial 90 day period. This extension will not exceed and [sic] additional 90 days. If your claim for benefits is denied, you will receive a written explanation giving reasons for the denial, a description of any additional information necessary for you to perfect the claim, as well as the explanation of the claim appeal procedure.

> If you are not satisfied with the decision, you may appeal to the Claims Fiduciary, Benefits Division, Human Resources Department....

> If you should desire an appeal, it must be in writing to the Claims Fiduciary. It must set out the reasons for the appeal and your disagreement or dissatisfaction. Any documentation to support your decision should be included. Upon written request, you may review plan documents that pertain to your appeal. This appeal *must* be made within *60* days of the receipt of the letter denying the claim.

> The Claims Fiduciary will promptly review the claim and will provide a written decision .... within 60 days of receipt of the appeal, unless special circumstances exist requiring an extension of time. If that is the case, the Claim Fiduciary will notify you in writing before the expiration of the initial 60–day period. This extension will not exceed an additional 60 days.

This appeal procedure relates explicitly to "claims." A "claim," as the plan uses and defines the term, is a request made only after treatment has been given and a cost incurred. "Claims," therefore, are distinct from the type of before-the-fact request made by Matkin, which was that Healthsource affirm it would provide coverage for services that had not yet been performed. Nowhere does the plan spell out an appeal procedure for the type of preauthorization request for coverage that is at issue here.

Despite having taken the position on February 19 that the administrative record was closed, it is apparent that Healthsource was nonetheless still gathering information regarding Matkin's proposed treatment. For example, on February 20, it received a third

opinion from Dr. Desch. Dr. Desch continued to believe that the treatment was not "required," because "[t]here is no scientific data that proves this population of patients has better results than with standard chemotherapy," and because "[a] prognostic determination about the usefulness of this treatment cannot be made with certainty in this situation." He noted, however, that

[t]he treatment is at least as good as standard therapy. The published results over the past few years show consistently that the treatment produces a high response rate and disease free survival. However, it is not clearly better than standard therapy because randomized clinical trials in this population have not been published. [One recent] study ... does provide suggestive evidence the treatment be better. However, the study does have limitations[.]

Further, Healthsource apparently asked Matkin to travel to the University of Alabama at Birmingham to obtain a second opinion during this same post-appeal period, which she did. The result was that Matkin underwent further low-dose chemotherapy in March and April 1996, because the University's physicians determined that she was not a good candidate for HDC.

In any event, on February 21, 1996, Matkin filed a complaint against Healthsource under a number of theories, including disability discrimination under state and federal law; sex discrimination under state and federal law; breach of fiduciary duty under ERISA, 29 U.S.C. § 1109; and declaration of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B).

At some point after Matkin filed suit, the parties arranged for her to undergo her desired treatment, with the financial responsibility to be determined later. She was treated in May 1996, and afterwards, again requested that the matter be reviewed. Healthsource, however, again took the position that the administrative record had been closed.

The parties filed cross-motions for summary judgment, and the district court granted partial summary judgment for the plaintiff with respect to Healthsource's denial of benefits. It first addressed the question of the content of the administrative record, noting Healthsource's position that the record was closed 60 days after it received Matkin's appeal of the initial denial of benefits, and thus did not include all the supplemental material provided by Matkin's attorneys. It concluded that Healthsource's position was arbitrary and capricious:

There was no justification for [Healthsource] to close the administrative record when it did so. The plan provides that the appeal must be begun within 90 days of the initial denial of benefits. Without question, Matkin initiated a timely appeal. The plan states that the appeal should include those materials that the insured wishes to be considered. The plan further states that, absent "special circumstances," [Healthsource] will inform the insured within 60 days of receipt of the appeal as to the result of the appeal. There is nothing magical about the 60 day period. If [Healthsource] desires, it can extend that period further in order to make its final determination.

The court distinguished this case from cases in which appeals followed a claim denial for a loss that had already taken place:

In that case, there would be little profit to dragging on the appeals process by entertaining additional submissions each time the claim was denied. In the instant case, the claim was a request for preauthorization, and Matkin's medical condition was a constantly evolving situation. In a complex, constantly changing case such as this one, particularly one that involves nothing less than the life and death of the patient, [Healthsource]'s decision not to entertain the material amounts to a failure to offer her a full and fair hearing on appeal as required under ERISA. For [Healthsource] to permanently foreclose a course of treatment based on a static snapshot of a dynamic disease process is unwarranted, not to mention unfair.

The court further observed that "though [Healthsource] was telling Matkin that the record was closed, it was still gathering information about her condition."

520

The court then decided that, under the circumstances, the appropriate course would be simply to "regard [the disputed] materials as included in the administrative record." It first considered the opinions of Drs. Cirenza and Desch, which it characterized as "equivocal." It then reasoned that "[t]hese positions must be offset by ... Matkin's submissions to the review committee," which it concluded were far stronger. And finally, it noted that Healthsource operated the plan "under a conflict of interest," since it both administers and funds the plan:

> It would be nonsensical to fail to recognize that HDC is far more expensive than SDC.... A policy of paying claims for HDC will certainly increase the routine cost of treatment for metastatic breast cancer. Particularly where a claims administrator also funds the plan, there is a tension between the fiduciary duty to administer the plan for the benefit of the participants and the fiscal pressures to keep costs down.
>
> ... When viewed in light of [Healthsource]'s conflict of interest, the decision that HDC was not "medically necessary" ... was arbitrary and capricious.

The parties then entered a stipulation in which Matkin dismissed, with prejudice, her discrimination claims, and dismissed, without prejudice, her breach of fiduciary duty claim. The district court entered judgment, certifying its order as final under Fed.R.Civ.P. 54(b), see *J.I. Case Credit Corp. v. First Nat. Bank*, 991 F.2d 1272, 1275 (7th Cir.1993); *Pedrina v. Chun*, 987 F.2d 608, 610 n. 4 (9th Cir.1993), and the defendant filed a timely appeal.

## II.

■ Because the Healthsource plan expressly grants the administrator discretionary authority to determine eligibility for benefits, as well as over administrative decisions such as whether to treat the record as closed, we review the administrator's decision to deny benefits using "the highly deferential arbitrary and capricious standard of review." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996); see *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). This standard "is the least demanding form of judicial review of administrative action.... When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 241 (6th Cir.1995) (citations and internal quotation marks omitted). Thus, the standard requires that the decision "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir.1991).

■ We review *de novo*, however, the district court's grant of summary judgment in an ERISA claim. See *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991). In other words, our task is to "determine if there is any genuine issue of material fact whether the insurance company's decision to deny benefits was arbitrary or capricious." *Id.*

## III.

### A.

■ We consider initially whether, upon a review of the information actually considered by Healthsource in denying benefits, it can be said that the denial was arbitrary and capricious. We conclude that it cannot, and that the district court erred in concluding otherwise. Healthsource based its denial on the opinions of Drs. Cirenza and Desch, which opinions Healthsource accurately described in its letters to Matkin, denying benefits. Drs. Cirenza and Desch concluded, on various bases, that Matkin's proposed treatment was not appropriate under the policy. Those opinions were tempered, but they were not ambiguous, and they were not equivocal. If those opinions had been the only information available to Healthsource in connection with Matkin's request for benefits, we would have no hesitation in concluding that its denial would have to be upheld,

especially given the highly deferential standard to which we are subject.

### B.

■ The key question, however, is what constitutes the universe of information that Healthsource should have considered. As we shall explain, Healthsource acted arbitrarily and capriciously in formulating the limitations it placed on the information it would take into account.

■ Healthsource both funds and administers the plan at issue here. Accordingly, it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir.1997). That is, "[a]s administrator, it interprets the plan, deciding what expenses are covered, and as issuer of the policy, it ultimately pays those expenses." *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir.1998). Healthsource characterizes this situation as giving rise to a "potential conflict" of interest. This characterization is incorrect: there is an actual, readily apparent conflict here, not a mere potential for one. The question is simply whether Healthsource's actions vis—vis Matkin were improperly influenced by its conflict. In *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Court noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* at 109, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)); *see Peruzzi*, 137 F.3d at 433.

Healthsource argues that the district court erred with respect to its conclusions regarding the conflict of interest, because Healthsource relied entirely on the advice of independent medical reviewers in concluding that the procedure requested by Matkin was not medically necessary. This is true, as far as it goes: the doctors who actually reviewed Matkin's request had no financial stake in the performance of the Healthsource plan. This observation, however, does not address the heart of the procedural peculiarities in this review process.

■ As we have already described, the plan does not prescribe an appeal procedure for the preauthorization context; the appeal procedure to which Healthsource points relates exclusively to claims for procedures that have already been undergone. Thus, Healthsource's protestations to the contrary notwithstanding, the plan cannot be said to have required Healthsource to reject the additional material; by its terms, the plan simply does not address the proper procedure for appealing from a denial of preauthorization. And as the district court observed, the distinction between an appeal from a claim denial and an appeal from a preauthorization denial is not an empty one. A preauthorization denial implicates wholly different considerations from a denial of a claim for already-accrued costs. In the latter case, the universe of relevant information is frozen at the time that the procedure was undertaken; in the former case, there is a dynamic situation with constantly evolving considerations. This is illustrated rather dramatically here, when Healthsource's expressed reason for denying coverage was that there was insufficient clinical data supporting use of HDC in Matkin's circumstances. If a new study definitively proving the efficacy of HDC had come out after Healthsource's initial denial but before Matkin had undergone treatment, we doubt that Healthsource would take the position that it does not have to consider the study.

We note, further, that Healthsource continued to review information pertaining to Matkin's request for benefits after the deadline it had communicated to Matkin. The third opinion from Dr. Desch and the information received from the University of Alabama favored Healthsource's denial of benefits—but obviously, it is not open to a plan administrator to curtail consideration of the information propounded by the plan beneficiary, while continuing to accumulate information that bolsters a denial decision already made.

In sum, taking into consideration Healthsource's conflict of interest, we conclude that Healthsource acted arbitrarily and capriciously. It was not required by the plan to forestall consideration of additional information, and it in fact *did* consider additional

information favorable to the denial of benefits. This behavior makes no sense in the absence of an improper financial motive, and we therefore infer that Healthsource's actions were shaped by its conflict of interest.

### C.

The district court erred, however, in conducting its own review of the material submitted by Matkin and concluding that this material outweighed the opinions of Drs. Cirenza and Desch. That material was never considered by Healthsource. There can be no dispute that in this circuit, in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator. *See, e.g., Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir.1990). Instead, given that it was arbitrary and capricious for Healthsource to treat the administrative record as closed prior to a consideration of Matkin's submissions, the solution is for the case to be remanded. Healthsource must be allowed to conduct a review in the first instance, considering the relevant material it originally excluded.

### IV.

We **AFFIRM** in part and **REVERSE** in part, and **REMAND** for further proceedings.