**John P. NICHOLAS, Plaintiff–Appellant,**

v.

**STANDARD INSURANCE CO., Defendant–Appellee.**

No. 00–1728.

United States Court of Appeals, Sixth Circuit.

Oct. 9, 2002.

Before RYAN and BOGGS, Circuit Judges; and HAYNES, District Judge.*

BOGGS, Circuit Judge.

Plaintiff John Nicholas appeals the grant of summary judgment to Standard Insurance Company on his Michigan state-law claims for breach of contract based on the denial of long-term disability benefits. We are asked to determine whether Nicholas's long-term disability insurance plan, for which Standard was the insurer, was an employee benefits plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (ERISA), and consequently whether Nicholas's state-law claims were preempted under ERISA. We conclude that the plan was governed by ERISA, and that Nich-

---

* The Honorable William J. Haynes, United States District Judge for the Middle District of Tennessee, sitting by designation.

olas failed to raise a genuine issue of material fact as to whether or not Standard acted arbitrarily under the ERISA arbitrary and capricious standard. We therefore affirm the judgment of the district court.

## I

John Nicholas was a vice president of sales and marketing with CTA Acoustics, Inc. He suffered from heart problems dating back to the late 1980s and early 1990s, when he was diagnosed with heart disease, and underwent a series of angioplasties. In the mid–1990s, he had a cardiac catheterization, and three more angioplasties. In 1996, Nicholas had heart surgery again, and his cardiologist told him to stop working.

Nicholas then sought long-term disability under CTA's insurance policy, which had been purchased from Standard Insurance. Jim Tomaw, CTA's director of human resources, authorized Nicholas to receive both short-term disability benefits and an extension of short-term benefits while he sought long-term disability benefits. Standard, however, made all eligibility determinations under the long-term disability plan.

In order to be considered disabled under Standard's long-term disability plan, an employee must establish that he is unable to perform his occupation, or is unable to perform any occupation at all. The plan language defined "own-occupation" disability by noting:

> You are Disabled from your own occupation, if, as a result of Sickness, Injury, or Pregnancy, you are unable to perform with reasonable continuity the material duties of your own occupation.

and "any-occupation" disability as:

> You are Disabled from all occupations if, as a result of Sickness, Injury or Pregnancy, you are unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training and experience.

Nicholas argued that he met the requirements for "own-occupation" disability, because his heart condition prevented him from performing the duties of his position as vice president of sales and marketing.

Mark Hesse, a Standard disability benefits analyst, reviewed Nicholas's claim. Nicholas's application for long-term disability benefits included medical records from his previous heart surgeries, and a report from his treating cardiologist, Dr. Schreiber. Dr. Schreiber indicated in his report that Nicholas suffered from "Class III–C" coronary artery disease, which indicated a patient "with marked limitation of physical activity." Such a patient is comfortable at rest, but experiences symptoms with the "milder forms of ordinary activity." However, other reports indicated that Nicholas did not suffer regular or constant heart pain, and was capable of light exertion. Unconvinced that Nicholas was disabled, Hesse requested an independent review by Dr. George Spady, an internist regularly retained by Standard to review medical claims. On his review of the medical records, Dr. Spady determined that Nicholas was not prevented from performing the core functions of his job as vice president of sales.

Hesse informed Nicholas that he did not appear to meet the group policy's definition of disability. Nicholas responded by providing evidence of two additional health conditions, psoriatic arthritis and psoriasis. Hesse sought additional medical records to substantiate these claims. Hesse also forwarded Nicholas's records pertaining to his heart condition to an independent cardiologist, Dr. Toren, for a review of Dr. Spady's conclusions. Dr. Toren deter-

mined that Nicholas was not prohibited by his condition from performing his job as vice president of sales. Specifically, Toren found that there was no indication that the stress created by Nicholas's job or the physical requirements of the job were causing cardiac symptoms that would limit the performance of central duties. Nicholas's medical records regarding his arthritis were reviewed by another independent specialist, Dr. Fraback, who similarly found that disability benefits should not be granted, because the arthritis did not prevent Nicholas from performing essential job functions. Both Toren and Fraback concluded that Nicholas was capable of sedentary work.

Hesse informed Nicholas that his claims would be denied, based on the judgments of Drs. Spady, Toren, and Fraback. Nicholas hired an attorney, and appealed the denial of benefits through Standard's internal review process. Karen Burch, another Standard employee, reviewed the denial, and upheld Hesse's determination. Nicholas requested another review several months later, based on a Social Security Administration award of disability benefits. Hesse responded that Standard would not change its disability benefits determination based on the SSA award.

The nature and origins of CTA's long-term disability (LTD) plan are of particular importance to this case. The plan was adopted by CTA as part of a negotiation process including three parties: CTA, Standard, and Willis Corroon, an insurance broker. Eddie Riddlebarger was an Account Executive for Willis Corroon; CTA was one of Riddlebarger's clients. CTA used Standard as its general insurance carrier, and had other plans (including short-term disability) from Standard. CTA asked Willis Corroon to help in the selection of a long-term disability plan. CTA and Willis Corroon settled on Standard, because CTA already had other policies through Standard. The policies were periodically reviewed, as part of the renewal process, by Riddlebarger and Jim Tomaw, the CTA director of human services. Riddlebarger helped CTA make insurance policy decisions by gathering a series of estimates from different companies, and presenting them to the employer in an annual renewal book. Insurers contacted Riddlebarger with bids, which they would then update in response to Riddlebarger's statements regarding the client's requirements. CTA determined which policies it desired.

CTA's long-term disability plan was voluntary; the employee paid for the plan out of pre-tax dollars. CTA retained significant control over terms of the plan. For example, CTA made long-term disability insurance available only to salaried employees. CTA also changed the maximum monthly benefit on the LTD policy from $10,000 to $6,000. CTA did not, however, make individual benefits determinations under the LTD plan.

Nicholas sued in state court for breach of contract, based on the denial of benefits. Standard removed the case to federal court, arguing that because CTA was involved in the creation of the plan and exercised control over the contents, the long-term disability plan was governed by ERISA, and that ERISA preempted Nicholas's state-law claims. The district court agreed that the plan was governed by ERISA, and that the state-law claims were preempted. Applying ERISA's "arbitrary and capricious" standard for suits by ERISA beneficiaries against fiduciaries, the court determined that Nicholas had failed to raise a genuine issue of material fact as to whether or not Standard acted arbitrarily in denying benefits. Nicholas then appealed.

## II

### 1. ERISA and the Standard LTD Plan

■ An employee insurance policy is governed by ERISA if, among other factors, it is endorsed by the employer. The central question in this case is whether the employer, CTA, was so involved in the creation and administration of the insurance policy that we will consider CTA to have endorsed the plan. "The question of endorsement *vel non* is a mixed question of fact and law. In some cases the evidence will point unerringly in one direction so that a rational factfinder can reach but one conclusion. In those cases, endorsement is a question of law...." *Thompson v. American Home Assurance Co.*, 95 F.3d 429, 437 (6th Cir.1996), *quoting Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1135 n. 3 (1st Cir.1995). The district court granted summary judgment on the question of endorsement, determining that a rational jury would be compelled to find that CTA endorsed the plan. We therefore review *de novo* the district court's judgment that the LTD policy was an ERISA plan, and that Nicholas's state-law claims were preempted. *Ibid.*

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Because ERISA applies, the actual denial of benefits is reviewed under the "arbitrary and capricious" standard. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996).

ERISA preempts state-law claims pertaining to ERISA plans (also called "employee benefit plans"). Determining whether a plan is an employee benefit plan governed by ERISA involves a three-part inquiry:

First, the court must apply the so-called "safe harbor" regulations established by the Department of Labor to determine whether the program was exempt from ERISA. Second, the court must look to see if there was a plan by inquiring whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits. Finally, the court must ask whether the employer established or maintained the plan with the intent of providing benefits to its employees.

*Thompson v. American Home Assurance Co.*, 95 F.3d 429, 434–35 (6th Cir.1996) (citations and quotation marks omitted).

The parties' dispute centers upon the ERISA safe harbor provisions. Department of Labor regulations exclude a plan from ERISA regulation when:

(1) No contributions are made by an employer or employee organization; (2)[p]articipation [in] the program is completely voluntary for employees or members; (3)[t]he sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and remit them to the insurer; and (4)[t]he employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually ren-

dered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j). The parties agree that criteria (1), (2) and (4) are satisfied. We look therefore to the third criterion, that of endorsement or involvement. In *Thompson v. American Home Assurance Co.*, 95 F.3d 429, 436 (6th Cir. 1996), the Sixth Circuit first considered what actions by an employer constitute "endorsement" within the meaning of the regulation. *Thompson* examined two conflicting federal circuit decisions that attempted to determine whether or not the employer was so involved with a plan that the plan would not fall under the safe harbor provisions. The court first examined the Fifth Circuit's opinion in *Hansen v. Continental Ins. Co.*, 940 F.2d 971 (5th Cir.1991), in which an employer had distributed a booklet, embossed with its logo, to all employees, and had encouraged them to give the policy "careful consideration." The *Hansen* court determined that this was an endorsement under the regulations, subjecting the plan to ERISA control. *Hansen*, 940 F.2d at 978. The *Thompson* court also examined the First Circuit's opinion in *Johnson v. Watts Regulator Co.*, 63 F.3d 1129 (1st Cir.1995). In *Johnson*, the First Circuit held, on facts similar to *Hansen*, that a simple connection between the employer and the plan (as when an employer sends a letter referencing the plan) was not sufficient to support a finding of endorsement. *Johnson*, 63 F.3d at 1136. The central principle of endorsement, *Johnson* noted, was lack of employer neutrality toward a plan. Ibid. Johnson therefore required evidence of active involvement by the employer in the creation, maintenance, or administration of the plan, such that a rational factfinder could determine that employer neutrality had been compromised. *Ibid.*

*Thompson* adopted the *Johnson* analysis, noting that "[t]he crucial task before

the court ... is to determine the set of circumstances in which employer neutrality is compromised to such an extent that ERISA should provide the governing framework" and noted that "a finding of endorsement is appropriate if, upon examining all the relevant circumstances, there is some factual showing on the record of substantial employer involvement in the creation or administration of the plan." *Thompson*, 95 F.3d at 436.

*Thompson* set forth several factors for courts to use in determining whether an employer is neutral with respect to a given plan. "[W]here the employer plays an active role in either determining which employees will be eligible for coverage or in negotiating the terms of the policy or benefits provided thereunder, the extent of employer involvement is inconsistent with 'employer neutrality' and a finding of endorsement may be appropriate." *Thompson*, 95 F.3d at 436. *Thompson* also noted: "[w]here the employer is named as the plan administrator, a finding of endorsement may be appropriate." *Ibid.* Finally:

> [W]here the employer provides a summary plan description that specifically refers to ERISA in laying out the employee's rights under the policy or that explicitly states that the plan is governed by ERISA, the employee is entitled to presume that the employer's actions indicate involvement sufficient to bring the plan within the ERISA framework.

*Thompson*, 95 F.3d at 437.

CTA did not act neutrally in the creation of the plan, nor in the selection of plan contents. Nicholas asserts that Willis Corroon, the insurance agency, and Riddlebarger, the broker, were essentially free agents, who received bids for CTA's business, then presented the best bid to CTA. Standard asserts that Willis Corroon

was CTA's agent in negotiating the plan terms.[1]

Riddlebarger testified to his relationship with CTA:

I ... provide them with employee benefit programs and do it in a manner to be as little a hassle as possible for them, where they do not have to work with different insurance companies and different brokers on a daily basis.... They've got me to go out one time per year and say to them, you have a competitive plan or you don't have a competitive plan, and if you want to change, we can change; if you don't want to change, we won't change; you're the boss.

From this description, CTA did not simply allow insurers to advertise a range of predetermined plans to their employees. CTA was named the Plan Administrator. Jim Tomaw regularly met with Riddlebarger to determine what coverage CTA wished to have, and the extent of such coverage. CTA adjusted the benefit payment on the LTD plan downward. CTA restricted the LTD option to salaried employees. These actions are inconsistent with employer neutrality under *Thompson*.

Finally, the summary plan description unequivocally stated that the LTD plan was an ERISA plan.[2] The description informed employees of "Your Rights Under ERISA" and informed employees that

they had a right to suit in a federal forum, to examine plan documents, to obtain copies of plan documents, to receive a copy of the annual report, and to a written explanation of denial. The summary also informed employees how to protect their rights under ERISA, and noted that ERISA prohibits discrimination intended to prevent employees from receiving a plan benefit or from exercising their rights under ERISA.

Nicholas argues that the plan is not an ERISA plan because he never received a copy of the summary plan description, and therefore, he asserts, he was never informed that the plan was governed by ERISA. This argument falsely conflates two ERISA-related rules, neither of which are applicable to this case. First, ERISA requires notice to an insured of his rights under a policy. Benefit plan administrators are required to provide participants and beneficiaries with copies of the plan's annual report, a statement of rights under the plan, and a statement of benefits accrued. 29 U.S.C. §§ 1024, 1025. These provisions are not applicable to the instant case. Nicholas is not suing for denial of his informational rights under ERISA; if he did, he might be entitled to the statutory penalty for failure to provide plan documents. However, the fact that his ERISA

---

1. The parties dispute whether or not Willis Corroon was CTA's agent in negotiating premiums and plan benefits with Standard. An agency relationship arises as "the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control and that the other consents to do so." Restatement (Second) of Agency § 1, cmt. a (1958). The question of agency is not easily decided where, as here, the agents were independent brokers. However, CTA's direct actions, through Jim Tomaw and other CTA employees, are sufficient to show employer involvement in and control over the plan.

2. Contrary to page 3 of the dissenting opinion, the SPD issued by CTA was entitled "Certificate and Summary Plan Description," and contained subheadings titled "ERISA Summary Plan Description Information," and "ERISA Information and Notice of your Rights," which were listed on a unified table of contents. These documents are consecutively paginated, and were presented to the court as part of the same exhibit attached to Standard's Motion to Preempt. JA 344–65.

rights may have been denied in no way alters the nature of the plan.

Second, one of the requirements for a judgment that a plan is an employee benefit plan governed by ERISA is that there is indeed a "plan." On this standard, we ask whether a reasonable person could ascertain the intended benefits, the class of beneficiaries, and the procedures for receiving benefits. *Thompson,* 95 F.3d at 434–35. The reasonable person test does not mean that a specific employee has to know that a plan is governed by ERISA before that statute applies. Rather, it means that if a reasonable person in possession of the facts would be able to discern that a plan existed, then that plan is possibly (dependent on the other factors) an ERISA plan. We therefore reject Nicholas's contention that the plan is not an ERISA plan as applied to him because he allegedly did not receive a copy of the summary plan description.

Under *Thompson,* when an employer determines which employees will be eligible for coverage, negotiates the terms or benefits of the policy, is named as the plan administrator, and provides a summary plan description describing the plan as an ERISA plan, the plan is governed by ERISA. *Thompson,* 95 F.3d at 436–37. All of these factors are present in this case. We therefore affirm the judgment of the district court that the long-term disability policy was an employee benefits plan governed by ERISA.

2. ERISA Preemption and the Arbitrary and Capricious Standard

■ ERISA contains a broad preemption provision, and acts to "supersede any and all State laws insofar as they may ... relate to any employee benefit plan...." 29 U.S.C. § 1144(a). The Supreme Court has interpreted the term "relate to" very broadly: a law relates to an employee benefit plan "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Here, Nicholas's state-law contracts claims are preempted: they are attempts to sue on the plan itself. The only claims Nicholas may bring, therefore, are claims challenging the denial of benefits under ERISA.

Under ERISA, an insurer granted discretion to determine benefits by the terms of a plan is subject to an extraordinarily lenient standard of review. The "arbitrary and capricious" standard requires only that the claim fiduciary's decision be "rational in light of the plan's provisions." *Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6th Cir.1988). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Davis v. Kentucky Finance Cos. Retirement Plan,* 887 F.2d 689, 693 (6th Cir. 1989) (citations omitted). Courts recognize that a conflict of interest exists when an insurer both decides whether an employee is eligible for benefits and pays those benefits. If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor in determining whether there is an abuse of discretion." *Killian v. Healthsource Provident Administrators,* 152 F.3d 514, 521 (6th Cir.1998) (citations omitted). However, we still apply the arbitrary and capricious standard, keeping in mind the insurer's conflict of interest. *Ibid.*

■ Nicholas argues that Standard's denial decision was arbitrary because Standard ignored Dr. Schreiber's opinion that Nicholas was unable to perform his job based on his advanced coronary disease. Standard, however, provided a reason for the denial. Standard's experts

believed that the records showed that Nicholas was not prevented from engaging in light activity by either his heart disease or his arthritis. The records indicated that Nicholas was able to play golf, was generally free from heart pain or other symptoms, and had been able to perform his work despite his heart disease for a number of years.

Standard also found that Nicholas's job duties were sedentary, based on the estimation of its experts that he need lift no more than ten pounds at work. Because portions of the record indicated that during the relevant period Nicholas was able to engage in a light level of activity without limiting symptoms, the consultant and both independent specialists concluded that Nicholas would be able to perform the core functions of his own job, and was therefore not disabled under the plan definition.

Nicholas argues that Standard's experts did not actually examine Nicholas, but relied on the medical records that he submitted. Nicholas cites no authority indicating that an independent medical review conducted by an insurer must include an in-person examination. Nicholas also asserts that Standard ignored the fact that the Social Security Administration had awarded Nicholas long-term disability benefits. Standard simply disagreed with the SSA's judgment as to whether (1) Nicholas's job was sedentary and (2) whether or not Nicholas was capable of performing his work. Nicholas cites no authority indicating that an insurer is bound by a disability determination made by the SSA.

Finally, Nicholas relies on *Killian v. Healthsource Provident Administrators,* 152 F.3d 514 (6th Cir.1998), in which the Sixth Circuit held that it was arbitrary and capricious for an insurer to limit the information that the claimant could offer in favor of his claim, when the insurer did not reject other information that weighed against granting the claim. *Id.* at 521. Nicholas argues that the fact that the claims file did not elicit certain specific information, including how the demands of being vice president of sales exacerbated his cardiac condition, shows that Standard manipulated the information flow to favor evidence supporting denial of benefits.

We reject this argument. There is no evidence that information against the claim was favored by the claim procedures. Mark Hesse sought and received information in both support of and opposition to the claim. In Hesse's letter denying benefits, he stated: "[i]f you request a review, it may help your claim if you provide medical documentation describing limitations or restrictions which preclude you from working in your own occupation." When Karen Burch reviewed the denial of benefits at the request of Nicholas, she requested "any additional information you wish to have considered...." Because there was adequate room in the claims process for any argument that Nicholas wished to assert, we do not find Standard's denial of benefits to be arbitrary by virtue of procedures unequally restricting the information upon which the decision was based.

Standard based its decision on the recommendations of three separate physicians, and followed their conclusions regarding whether or not Nicholas could perform his job without limiting symptoms. The denial procedures did not unfairly restrict information in favor of Nicholas's application. Under our precedent, the denial of benefits was reasoned, which is all that ERISA requires of plan fiduciaries making benefits decisions.

III

The plan in question was an employee benefit plan governed by ERISA, and

Nicholas's state-law claims were preempted as relating to an ERISA plan. The denial of benefits was not arbitrary or capricious. We therefore AFFIRM the judgment of the district court.

HAYNES, District Judge, Dissenting.

HAYNES, District Judge.

For several reasons, I dissent from the majority's holding that the long-term disability policy offered to salaried employees of CTA satisfies the safe harbor provisions in ERISA regulations, 29 C.F.R. § 2510.3(1)(j) as interpreted by this Court in *Thompson v. American Home Assurance Co.*, 95 F.3d 429 (6ᵗʰ Cir.1996). In my view, the proof about this policy and its administration fails to establish the requisite substantial employer involvement to constitute the employer's endorsement to remove the policy from ERISA's safe harbor provisions. "[T]he premise" of this regulation is "that the absence of employer involvement vitiates the necessity for the ERISA safe guards." *Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1133 (1ˢᵗ Cir. 1995).[1]

In *Thompson*, we adopted the First Circuit's analysis of ERISA's safe harbor regulations in *Johnson*. Under *Thompson* and *Johnson*, the analysis begins with a review of the evidence from the employees' perspective. "The court agrees, however, with the holding of the *Johnson* court that the relevant framework for determining the employer's involvement in the creation or administration of the policy from employees' point of view," 95 F.3d at 436–37, citing *Johnson*, 63 F.3d at 1134, 1137, n. 6.

The majority fails to reflect whether its analysis is from the employees' perspective. As discussed below, when the policy is viewed from such a perspective, the material evidence is that CTA did not endorse this policy for ERISA coverage. The majority's opinion reference to the vantage point of a reasonable person, Opinion at p. 564, applies on whether the policy is a plan under ERISA, but does not apply to whether the safe harbor provisions are satisfied. Our review here is *de novo* with all favorable inferences in plaintiff's favor as the opposing party. *Smith v. Ameritech*, 129 F.3d 857, 863 (6ᵗʰ Cir. 1997).

An employee would not perceive the policy to be endorsed by CTA for ERISA coverage. First, the policy at issue that is entitled "Voluntary Long–Term Disability for Salaried Employees" does not reflect CTA's endorsement. To be sure, the "Group Long–Term Disability Insurance Policy" lists CTA as the "policy owner" and has a statement of ERISA rights. Yet, Michael V. Domulewicz, CTA's chief financial officer, stated that: "[n]o employees of CTA Acoustics, Inc., were ever informed that the Standard Insurance Company long-term disability policy was an ERISA benefit ... The officers and executives of CTA Acoustics never considered the Standard Insurance Company long-term disability policy to be an ERISA benefit for its employees." J.A. at 563, 564. J.A. at 995, 1000.

The majority opinion notes that a summary plan discription of Standard's policy was distributed to CTA employees.[2] The

1. Whether ERISA applies, "can make a pronounced difference" because "preemption may cause potential state-law remedies to vanish ... or may change the standard of review ... or may effect the admissibility of evidence ... or may determine whether a jury trial is available." *Johnson*, 63 F.3d at 1131 (citations omitted).

2. In footnote 2, the majority states that the full summary plan description which is reprinted at JA 344–65 was distributed to CTA employees. The summary description plan

distribution, however, was by Standard. Before the district court, Standard's counsel explained that "we are reasonably expected to bring notices to the employees." J.A. at 1126. Standard distributed another document entitled "ERISA Summary Plan Description Information" that refers to CTA as the "Plan Sponsor" and "Plan Administrator," J.A. at 857, and provides a list of ERISA rights. J.A. at 871. Beverly Majors, an account service manager with Willis Corroon, conducted the initial enrollment of CTA employees at its Troy, Michigan facility. J.A. at 1373–74, 1626.

Plaintiff's proof reflects that CTA did not distribute a Summary Plan Description ("SPD"), as required by 29 U.S.C. §§ 1024 and 1025, for covered ERISA plans. CTA's salaried employee handbook and employee benefit program for salaried employees do not contain any reference to ERISA. According to James Tomaw, CTA's director of human services, these booklets were the only information CTA provided to salaried employees about this policy. J.A. at 1327. While the majority correctly notes that Plaintiff is not suing for denial of information rights, when this fact of non-distribution is viewed from the employees' perspective, an employer's failure to issue a SPD may be reasonably construed by the employee to mean that the policy is not an ERISA plan. Moreover, consistent with the statement of CTA's chief financial officer, the proof of CTA's failure to issue a SPD also reflects its view that this policy is not an ERISA plan.

For the claim process under this policy, the employee must submit "a written authorization for us [Standard] to obtain information and any other items we may reasonably require in support of your claim." J.A. at 865. Standard actually collected the information on Plaintiff's claim." J.A. at 893, 896, 950. Standard's publication clearly provides that claims are to be filed on "our [Standard's] forms." J.A. at 865. For Plaintiff's benefit claims, Olive Bailey, CTA's personnel administrator, informed Plaintiff: "After Standard Insurance reviews you claim, they will notify you of approval...." J.A. at 367. Mark Hesse, Standard's "disability benefits analyst" wrote all of the letters to Plaintiff, informing him initially that: "it does not appear that you meet the group policies definition of disability" and requesting more information. J.A. at 952. See also J.A. at 978. On Standard's stationary, Hesse also issued the final decision that: "We have completed a thorough review of the information in your claim file. Based upon this review and the terms and provisions of the CTA ... group policy, your claim must be denied." J.A. at 989. To obtain a review of that decision, Hesse directed Plaintiff to file his request with "Standard Insurance Company, Group LTD Department." J.A. at 994. Standard's quality assurance unit denied relief on Plaintiff's request for a review. J.A. at 1003–04.

As found by the majority, Plaintiff has satisfied all of the elements that this policy does not qualify for the ERISA safe harbor regulation, except for the issue of substantial involvement of the employer. As to CTA's actual involvement with this policy, the majority writes that James Tomaw made four decisions: he selected the Standard policy; he lowered the benefit under the Standard policy; he restricted the long-term disability to salaried employees; and he negotiated the reduced rate without any participation by CTA. J.A. at 1495.

cited by the majority was written on Standard Insurance letterhead, was created, published and distributed solely by Standard. The

ERISA references in this document are Standard's, not CTA's.

Tomaw testified that Eddie Riddlebarger, a Willis Coroon insurance agent, presented him with a proposal of several policies and then Tomaw made a decision as to which company would provide coverage. J.A. at 1334. In a word, Riddlebarger would obtain long-term disability policies from different companies. According to Tomaw, this list "was part of the package that Eddie Riddlebarger presented to me upon which he was making recommendations to me and I would make my decision on who to go with and who not to go with ... *I don't want you to think that I went to Eddie and said, Eddie, I want you to do this, this year and this way; that's not what happened.* He presented to me and I made my decisions from that." J.A. at 1340–41 (emphasis added). Tomaw also stated that from his research of CTA business records, CTA does not have any notes or documents evidencing its discussions of various plans. J.A. at 75.

As to the selection of the Standard policy for CTA employees, Tomaw never had direct negotiations with Standard: "Q: Did you ever negotiate with Standard Insurance Company on any term of coverage relating to the long-term disability plan. A: Never have." J.A. at 1335. Tomaw described the typical manner of changes in the plan as follows:

Q: Well, if you wanted to modify— each of the benefits that the company's offering, you know, pays benefits under certain conditions. Your medical plan has certain things that are covered and certain things that are not covered.

A: Yeah, to give you an example, this year we changed our short-term disability for our hourly workforce; we changed the term of coverage from 26 weeks to 52 weeks. Is that what you're talking about?

MR. ALAIMO: Yes.

A: Yes. Yes. We did that this year.

Q: And then you would direct Eddie to find an insurance company that's going to provide a policy that handles that kind of term?

A: Actually, Eddie suggested that to me, and I said, yeah, that sounds good, so then he came back to quote us for the price.

Q: And the same would be true for the LTD policy, as well?

A: If we wanted to change that term, yes, that's the way we would handle it.

J.A. at 1306–07. Tomaw stated in his affidavit as follows: "I was not involved in and have no personal knowledge regarding the decisions and/or negotiations between CTA and Standard Insurance Company, *if any*, concerning the Group LTD policy that may have preceded its issuance to CTA by Standard Insurance in 1993." J.A. at 752.

As another example of CTA's lack of substantial involvement in the selection of policy terms, when there was a change in insurance companies in 1996, Riddlebarger testified "there was a reason to revise the Life of Georgia application for long-term disability and *I had made some changes*, ..., and sent it to Jim Tomaw and CTA Acoustics and asked him to sign the revised application and send it back to me." J.A. at 1532 (emphasis added).

As to whether CTA made disability determinations and authorized Plaintiff's receipt of short-term disability benefits pending a decision on long-term benefit, "Standard, not CTA, would make all of the decisions to either grant or deny long-term disability benefits ... [and] short-term disability benefits." J.A. at 753. CTA never objected to any benefits decision by Standard. *Id.* Further, Tomaw stated that "[s]ince January 1, 1994, CTA has not made any of the decisions about whether

to grant or deny claim for disability benefits that were submitted by employees pursuant to the group LTD policy issued by Standard Insurance to CTA in 1993." J.A. at 754.

As to the lowering of the benefits, Tomaw testified that Eddie Riddlebarger, Willis Coroonr's insurance agent, actually undertook the effort to secure the reduced benefits:

A: I actually don't recall that they were specifically discussed with Eddie. I looked at this, read it, understood it. But that was it."

Q: But you didn't direct Mr. Riddlebarger to try to find a policy with different terms in it.

A: That's correct."

J.A. at 1258.

For the selection of the long-term disability terms, Tomaw testified that he did not personally review those terms.

Q: By signing this, you were agreeing that the options that had been selected there were the ones that you wanted for your plan for LTD?

A: It's an item on this form that was given to me by Eddie Riddlebarger, mailed to me by Eddie Riddlebarger; I signed it, returned it to him. I can tell you that nothing on this form was discussed other than the two-year rate guarantee and the amount of insurance— the only things I recall discussing with him. When I referred to this as a boilerplate policy— this is an example of what I call boilerplate; *these are options that you could take or not take. I've never seen them; I've never discussed them, don't know anything about them.*

Q: But you understood they were options that if you wanted to find out about, you could have?

A: As I look at this form now, I understand that. *I did not even look at that and consider it, cause it was never discussed.*

J.A. at 1267 (emphasis added).

As to the lowering of rates under the policy, the evidence is that Riddlebarger, the Willis Corroon agent, negotiated those terms.

Q: So you were able to negotiate a lower rate than they originally proposed.

A: Yes.

Q: Did you do that after any discussion with CTA.

A: No.

J.A. at 1495.

In my opinion, this testimony establishes that Standard was really making the decisions for the terms of the policy that CTA simply ratified in reliance upon Riddlebarger's judgment. Riddlebarger was an agent of Willis Corroon. Standard paid Riddlebarger's commission and CTA did not have any written agreement with Riddlebarger. J.A. at 1539, 1542. The evidence illustrates that CTA's role in the administration of the plan was primarily ministerial. CTA collected employee premiums for this policy, but remitted those premiums to Standard. CTA also maintained a list of the insured employees and assisted Standard in securing any necessary documentation. Yet, CTA employees paid all of the premiums and employee participation in this policy was voluntary. In none of these publications about the availability of this policy did CTA recommend that its employees subscribed to this policy. Any employee would realistically look only to Standard for answers and decisions about this policy.

Viewing this evidence from the employees' perspective and in a light most favorable to the Plaintiff, CTA did not have

substantial involvement with this long-term benefits policy. CTA's role in selecting Standard from several insurers who were identified by Riddlebarger is merely a "simple connection" that does not serve to compromise CTA's "employer neutrality" toward Standard's policy. Riddlebarger actually negotiated the policy terms and rates with Standard and CTA simply signed off on Riddlebarger's recommendation, trusting his judgment. CTA decided that only salaried employees will be eligibility, but thereafter, Standard administered the policy and made all coverage decisions initially and upon a request for further review. CTA does not have an active role in administering this policy. In *Johnson*, the employer selected the group policy that was offered to its employees and the insurer drafted its terms, but was nonetheless held to have insufficient involvement thereby qualifying under the ERISA safe harbor. 63 F.3d at 1131, 1135. To satisfy the substantial involvement element of ERISA's safe harbor regulation, more is required than an employer's simply choosing one of several insurance policy plans to offer to its employers.

In my view, these facts are strikingly similar to *Johnson* where the employer selected the insurer, recommended involvement in the plan, distributed enrollment cards, completed portions of claim forms, and maintained a list of eligible employees. 63 F.3d at 1136. In *Johnson*, as here: "[a]s long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under 28 C.F.R. § 2510.3-1(j).... It is only when an employer purposes to do more, and takes substantial steps in that direction, that it offends the ideal of employer neutrality and brings ERISA into the picture." *Johnson*, 63 F.3d at 1133. In *Thompson*, we found the First Circuit's approach in *Johnson* is directly in keeping with Congress' intention in enacting ERISA." 95 F.3d at 436.

"In some cases, the evidence will point unerringly in one direction so that a rational factfinder can reach but one conclusion. In those cases, endorsement is a question of law...." *Johnson*, 63 F.3d at 1135, n. 3. In my view, the facts here are strikingly similar to the facts in *Johnson* and warrant the conclusion that Standard's policy does not qualify as an ERISA plan. I would reverse the district court's judgment and direct the district court to remand the action to state court.