NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0551n.06

Case No. 18-6095

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Oct 31, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SUSAN CARD, aka Karen Card, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| PRINCIPAL LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

_____/

Before: COLE, Chief Judge; MERRITT and LARSEN, Circuit Judges.

**MERRITT, Circuit Judge.** This dispute arises over disability insurance policies held by plaintiff Susan Card that were underwritten and administered by defendant Principal Life Insurance Company. After Principal Life denied plaintiff's claims for short-term, long-term, and total disability, plaintiff filed a complaint under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), alleging that Principal Life breached its disability insurance contract with plaintiff by wrongfully denying her claim. The complaint further alleges that plaintiff was denied a full and fair review, due in part to Principal Life's inherent conflict of interest as both the evaluator and payor of claims under the policy. After the parties filed cross motions for summary judgment, the district court entered judgment for Principal Life. Because we conclude that Principal Life's decision was arbitrary and capricious, we vacate the judgment

of the district court. The record does not support the conclusion that Principal Life's denial of plaintiff's claim was the result of a deliberate, principled reasoning process regarding plaintiff's ability to perform her duties as a nurse given her condition. Because we cannot say on the record that plaintiff is entitled to short-term and/or long-term disability benefits, we remand to Principal Life for further review consistent with this opinion.

## I.

Plaintiff Susan Card, born in 1956, was employed as a registered licensed practical nurse. Before she stopped working in December 2013, she worked at a long-term care and skilled rehabilitation center in Maine owned by Continuum Health Services. She worked the night shift, providing patient care and supervising nursing assistants. Plaintiff's long-time, primary-care physician, Dr. Timothy Baum, referred her to Dr. Helen Ryan, a specialist in hematology/oncology. After a series of tests, she was diagnosed in February 2013 with chronic lymphocytic leukemia[1] by Dr. Ryan. At the time of her diagnosis, plaintiff was essentially asymptomatic according to Dr. Ryan's notes, although she had experienced some fatigue plaintiff thought might be due to changes in other medications or a thyroid issue. Plaintiff was scheduled to return in six months for further tests. Over the next few months, plaintiff began to experience

---

[1] Chronic lymphocytic leukemia ("CLL") is a typically slow-growing blood cancer found in a type of white blood cell called a B-lymphocyte (lymphocytes are white blood cells in lymph tissue). Leukemia is a type of cancer that affects the blood and bone marrow. CLL is characterized by the accumulation of small, mature-appearing lymphocytes in the blood, marrow and lymphoid tissues. Normally, lymphocytes help the body fight infection; however, in CLL, the body produces abnormal lymphocytes that cannot do this effectively. It is typically a chronic, long-term, slowly developing leukemia. Most people do not have symptoms when are diagnosed with CLL, and the disease is discovered after a routine blood test shows abnormalities. Symptoms of CLL include fatigue, enlarged lymph nodes, unintentional weight loss, chronic fever (without other signs of infection), easy bruising, or night sweats. The clinical progression of CLL is varied and ranges from patients who require treatment soon after diagnosis to others who do not require therapy for many years, if at all. Treatment, when called for, includes chemotherapy, chemoimmunotherapy and/or drugs targeting B cell receptor signaling. CLL impairs the immune system and the patient is not as able to resist infection like someone with a normal immune system. Infection (usually pneumonia) is the most likely cause of death of a CLL patient. A patient with CLL needs to be vigilant about avoiding germs and infections. Information gathered from Chronic Lymphocytic Leukemia Society website (found at www.cllsociety.org).

worsening fatigue and she reduced her work hours to 32 hours per week. On August 30, 2013, six months after her diagnosis, plaintiff went to see her primary care physician, Dr. Baum. She did not return to the specialist, Dr. Ryan, because she could not afford it. Dr. Baum's notes indicate that plaintiff complained of night sweats, "dramatic fatigue and easy exhaustion," chronic vaginal bleeding, and "feel[ing] depressed and wiped out." Dr. Baum concluded that "she is failing work because of her disease and needs to go out on disability." The bloodwork done that day showed an increase since February in plaintiff's white blood cell count and lymphocytes. Dr. Baum noted that he would like to do more bloodwork, but plaintiff could not afford the tests. He recommended follow up as needed, with no specific time period established.

Plaintiff did not stop working at that point, but her employer tried to accommodate her with decreased hours and lighter duty than her regular work as a charge nurse, but it had no "light" or "sedentary" positions. Plaintiff stopped working on December 13, 2013, due to fatigue and weakness that left her feeling unable to perform her job. She filed for short-term, long-term and total disability benefits with Principal Life on December 16, 2013. The required "Attending Physician's Statement" was completed by Dr. Baum and filed with plaintiff's claim application. He diagnosed chronic lymphocytic leukemia, fatigue and depression. Dr. Baum indicated that "maximum medical improvement" had been achieved and he checked the box indicating that that plaintiff could not return to work. Plaintiff saw Dr. Baum on January 28. 2014, for follow up bloodwork. She complained of fatigue, easy bruising, and weakness. Dr. Baum opined that he did not think she would be able to return to work, and scheduled her to come back in four months.

On March 17, 2014, plaintiff received a letter from Principal Life denying her short-term disability benefits because "she did not meet the definition of Disability" under the plan. Plaintiff returned to Dr. Baum on May 28, 2014, as directed at the January visit. She continued to suffer

from fatigue, as well as lack of energy and motivation. She had lost 15 pounds. She reported she had not been able to return to work, and she would be moving to Kentucky to live with her sister because she lost her house to foreclosure. Dr. Baum noted that her bloodwork "looked better" because "she has not been working[,] allowing her body to deal with her CLL better." He opined that she is "still dealing with chronic fatigue and I do not see her being able to have any work capacity." He instructed plaintiff to follow up with new doctors in Kentucky.

Plaintiff moved to Lexington, Kentucky, in July of 2014. In September 2014, she appealed the denial of her short-term disability benefits and informed Principal Life that she was pursuing her claim for long-term and total disability benefits as well. Principal Life indicated that it would need further medical records, to which plaintiff agreed. Plaintiff applied and was accepted for Medicaid in Kentucky, but she had difficulty finding physicians in the area who would take new Medicaid patients. Plaintiff saw Dr. Amy Schell, a specialist in hematology and oncology, on November 12, 2014. Dr. Schell noted that plaintiff's chronic fatigue was probably due to her chronic lymphocytic leukemia, but she wanted to do more testing, including bloodwork and CT scans. Plaintiff also saw Dr. Elvis Donaldson, a gynecological oncologist, in December 2014 for her chronic post-menopausal vaginal bleeding. Neither Dr. Schell nor Dr. Donaldson opined in detail on plaintiff's functionality, limitations or restrictions, except that Dr. Schell noted that plaintiff was at ECOG (Eastern Cooperative Oncology Group) grade 1, which restricts physically strenuous work, but allows light or sedentary work such as housework. These appear to have been initial visits with plaintiff's new Kentucky doctors. No further treating-physician medical records appear in the administrative record after December 2014.

Principal Life sent plaintiff a letter on December 2, 2014, denying her appeal for short-term disability benefits because the "information considered . . . does not support impairment from

your own job." Two weeks later, on December 13, 2104, Principal Life informed plaintiff by letter that it was denying her claim for long-term and total disability benefits because she was not "under the Regular and Appropriate Care of a Physician or [did not] meet the definition of Disability." Plaintiff appealed the denial of long-term and total disability benefits. On February 24, 2015, Principal Life denied plaintiff's application for all disability benefits because "you do not meet the definition of Disabled" under the plan. The final denial letter does not list lack of "Regular and Appropriate Care of a Physician" as a reason for denial.

Plaintiff filed a complaint in federal court on May 17, 2015, pursuant to ERISA, 29 U.S.C. §§ 1132 (a)(1)(B), (a)(3),[2] seeking legal and equitable relief. The parties filed cross motions for summary judgment and the district court granted defendant Principal Life's motion and denied plaintiff's motion. *Card v. Principal Life Ins. Co.*, No. 5:15-cv-139, 2018 WL 4344455 (E.D. Ky. Sept. 11, 2018). This appeal followed.

## II.

In her summary judgment motion and now on appeal, plaintiff argues she is entitled to relief because the medical evidence supports her claim of disability, and Principal Life both ignored relevant evidence and relied on flawed medical records in denying her claims. In response,

---

[2] 29 U.S.C. § 1132(a) provides in relevant part:

   (a) Persons empowered to bring a civil action

   A civil action may be brought--

     (1) by a participant or beneficiary--

       . . .

       (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

   . . .

     (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; . . . .

Principal Life argues that the denial of benefits was not arbitrary and capricious because the decision is supported by substantial evidence in the administrative record.

## A. Standard of Review of Principal Life's Decisions

As a threshold matter, we review the parties' arguments regarding the proper standard of review applicable in this case to Principal Life's decision to deny disability benefits based on the administrative record. Prior to its final decision, the district court ruled that it would review Principal Life's determination under the deferential "arbitrary-and-capricious" standard of review because Principal Life had sufficiently shown that the benefit plan in this case gives it authority to determine eligibility for benefits and construe the terms of the plan. *Card v. Principal Life Ins. Co.*, No. 5:15-139, 2016 WL 1298723 (E.D. Ky. Mar. 31, 2016). Plaintiff renewed her attack on the standard of review in her motion for summary judgment, and again in this appeal, arguing (1) that the plan's grant of discretionary authority was not final because Principal Life's internal procedures allowed for an "exception" process through which plaintiff's employer could request that a claim be paid under the plan, and (2) that because Principal Life is both the evaluator and payor of claims under the policy, the standard of review is altered. We agree with the district court's thorough analysis of plaintiff's arguments on this issue, and we will apply the arbitrary-and-capricious standard of review.

### 1. Discretionary authority

Plaintiff argues that the express terms of the plan prohibit Continuum from granting authority to another entity to determine benefit eligibility. ERISA allows employers such as Continuum to designate other fiduciaries to implement aspects of the plan, s*ee* 29 U.S.C. § 1102(c), and Continuum has delegated such authority to Principal Life. Here, the plan language explicitly provides Principal Life with the "discretion to construe or interpret the provisions of this Group

Policy, to determine eligibility for benefits, and to determine the type and extent of benefits." Policy at Article 9. The policy language tracks that used by the Supreme Court to grant discretionary authority to the plan administrator. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (applying the deferential "arbitrary and capricious" standard of review to administrative record because "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"); *accord Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006)*; Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).

Plaintiff also contends that Principal Life's internal operating procedures include a process whereby the employer may request that Principal Life grant benefits to the employee after a denial has been issued. She argues that the existence of such an "exception" procedure robs Principal Life of its authority as the final decisionmaker under the plan, which in turn requires *de novo* review of Principal Life's decision instead of the more deferential arbitrary-and-capricious standard. Plaintiff cites to a portion of deposition testimony by Nancy Taylor, an employee of Principal Life, to demonstrate the existence of an "exception" process, which is defined as "any decision that is not consistent with normal plan policy provisions and administrative processes." Taylor Dep. at 86.[3] While such a procedure may well exist, plaintiff does not cite any evidence showing that an exception request by an employer is automatically granted, or that any exception request otherwise usurps the final discretionary authority of Principal Life. The only reference in the administrative record to the process by which an exception is approved—here, taken from a section of Taylor's deposition—contemplates an examiner "not[ing] something and tak[ing] it to senior staff [of Principal Life] . . . to have a discussion about it." *Id*. at 88. In support of its position

---

[3] The language cited purportedly comes from Principal Life's claim manual, but the manual itself is not part of the administrative record.

that exceptions are not automatically granted, Principal Life provided the sworn statement of Lisa

Dickhoff, Assistant Director of Disability Claims for Principal Life, which states that

> Exceptions are not automatically granted when requested and had Principal Life received this Request [from Continuum], Principal Life would not have granted it because it does not request an exception Principal Life would agree to . . . .

Dickhoff Decl. at ¶ 4. This unrebutted evidence indicates that Principal Life preserved its

discretion, even in the case of an exception request by an employer. Even if it may grant exceptions

at the request of employers in certain circumstances, plaintiff has not presented any evidence that

Principal Life is not the final decisionmaker.

## 2. **Conflict of Interest**

The fact that Principal Life is both the evaluator and payor of claims under the policy does

not alter the standard of review. *See Smith v. Cont'l Cas. Co*., 450 F.3d 253, 260 (6th Cir. 2006).

Rather, the conflict of interest should be considered a factor in a court's review of the denial. *Id*.

The district court allowed the parties to conduct limited discovery for the purpose of determining

how the conflict should impact its review. Aside from a blanket claim of conflict, plaintiff makes

no specific allegation supported by particularized evidence that a conflict of interest affected

Principal Life's denial. As such, there is an insufficient basis to find that the inherent conflict had

an adverse effect on Principal Life's denial of benefits. We will review Principal Life's decision

under the arbitrary-and-capricious standard, with the inherent conflict of interest viewed as a factor

in the review of the denial of benefits.

## B. **The Denial of Benefits**

Under the arbitrary-and-capricious standard, the question is whether a plan offered a

reasoned explanation based on evidence for why a claimant was not disabled under the plan's

terms. *Evans*, 434 F.3d at 876 ("[A] decision will be upheld if it is the result of a deliberate

principled reasoning process, and if it is supported by substantial evidence.") (quoting *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998)). The review, however, "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id*. (quoting *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). Although the arbitrary-and-capricious standard is deferential, it is not a rubberstamp of an administrator's decision. *McDonald*, 347 F.3d at 172 (citation omitted). Rather, ERISA obligates courts to ensure that an administrator conducted a "'full and fair' review of claim denials." *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (quoting *Firestone*, 489 U.S. at 113). In reviewing the decision of the plan administrator, we may only consider the evidence in the administrative record, as that is the evidence that the plan administrator considered. *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 615 (6th Cir. 1998).

### 1. Exception Procedure

In addition to relying on the "exception" procedure described above to argue for a stricter standard of review, plaintiff also argues that the procedure, which allows Continuum to request a "decision that is not consistent with normal plan policy provisions and administrative processes," warrants judgment in her favor because Principal Life failed to inform Continuum that it could request an exception, and, if Continuum had requested an exception, it would have been granted. We agree with the district court that there is no evidence that an employer's request for an exception somehow supersedes a disability determination under the plan or that Principal Life is required to remind Continuum of its right to request an exception if it wishes. Principal Life introduced unrebutted evidence that exceptions are not automatically granted, and that the exception request in this case would have been denied in any event. Dickhoff Decl. at ¶ 4. Furthermore, in a letter informing Continuum of its denial of plaintiff's benefits claim, Principal

Life invited Continuum to write a "letter" explaining in detail why plaintiff could not perform her job. The record does not indicate that Continuum wrote such a letter until December 2016 after this litigation had commenced, or that it was unaware before that time that it could request an exception. The existence of an exception procedure of which plaintiff was unaware and that can be initiated only by her employer does not mandate that Principal Life grant her benefits claim.

## 2. **Principal Life's Denial of Benefits**

Plaintiff also argues that Principal Life's denial of her claim is not supported by the evidence in the administrative record. The burden lies with plaintiff to prove that she is entitled to benefits under the plan. The district court found that substantial evidence in the record supports Principal Life's decision. We, however, are not convinced. Plaintiff filed for three different types of disability benefits under the plan: short-term, long-term and total disability (the latter is referred to as Life Coverage During Disability). Each benefit type requires plaintiff to meet a different definition concerning her ability to perform work in order to show disability, and each covers a different timeframe. Despite the clear terms of the plan, the administrative record does not demonstrate that Principal Life applied the plan definitions when deciding plaintiff's claim for short-term and long-term disability benefits, and it failed to provide a reasoned explanation for its rejection of plaintiff's treating physicians' multiple opinions about her inability to work as a nurse based on the specific physical limitations the physicians imposed.

The plan language requires that the administrator consider whether each claimant can perform the specific duties of his or her job or occupation before making benefits determinations regarding short-term and long-term disability. A plan may not "completely ignore[ ] favorable evidence from [a claimant's] treating physicians" or "reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *Shaw v. AT & T*

*Umbrella Ben. Plan No. 1*, 795 F.3d 538, 548–49 (6th Cir. 2015). As demonstrated below, Principal Life failed to apply the medical evidence to the definitions from the plan, rendering its decision arbitrary and capricious and requiring remand.

### a. **Short-term disability**

Short-term disability under the plan applies to the first 90 days that a claimant is unable to work. In this case, the time period covered is from December 13, 2013, plaintiff's last day of work, to March 24, 2014. The plan defines "Disability" when "solely and directly because of sickness, injury, or pregnancy, . . . [the employee] cannot perform the majority of the Substantial and Material Duties if his or her Own Job." Your "Own Job" is defined as "[t]he job the [employee] is routinely performing for the Policyholder or a Participating Unit when his or her Disability begins." "Substantial and Material Duties" is defined as "[t]he essential tasks generally required by employers from those engaged in a particular job that cannot be modified or omitted. If [an employee] routinely works on average 40 hours or more per week, [Principal Life] will consider the [employee] able to perform the Substantial and Material Duties of the job if he or she is working, or has the capacity to work, 40 hours per week."

Plaintiff's job description at Continuum as a charge nurse required her to stand, walk, push/pull, lift, and bend "frequently," which means 30-45 minutes per hour. It also involves "frequent" exposure to infections, and exposure to "infectious waste, diseases, . . . [and blood-borne] pathogens. *See* Continuum's Job Description for Charge Nurse. Principal Life repeatedly acknowledged that plaintiff's "Own Job" as a charge nurse is classified as "heavy." *See, e.g.,* Principal Life's March 17, 2014, letter denying short-term disability benefits; Principal Life's file-review request to Reliable Review Services, dated Feb. 28, 2014. According to Principal Life's own "Occupational Analysis," this classification requires "[e]xerting 50 to 100 pounds of force

occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects.

Given this information about plaintiff's "Own Job," we must determine whether Principal Life made a deliberate, principled, reasoned decision that plaintiff's condition did not preclude her from performing her "Own Job" as a charge nurse at Continuum. On March 17, 2014, Principal Life sent a denial letter to plaintiff. The denial letter correctly states that in order to qualify for short-term disability benefits, "you must be restricted from working by your treating Physician, and be unable to perform the majority of the Substantial and Material Duties of your Own Job." The denial letter explained that Principal Life had reviewed Dr. Ryan's and Dr. Baum's notes and the labs on her bloodwork. The letter also stated that her file had been reviewed by an oncologist, Dr. Chao. The letter describes the technical contents of the treating physicians' notes and Dr. Chao's report, including plaintiff's complaints of extreme fatigue and weakness, but conclude that because her bloodwork is "essentially normal," "there is nothing from the diagnosis of CLL that would preclude you from working." There is no indication that Principal Life took into consideration plaintiff's physically demanding duties as a charge nurse or her ability to perform them. There is no discussion of why it ignored Dr. Baum's August 30, 2013, recommendation that plaintiff "needs to go out on disability," or his response in the attending physician's statement accompanying plaintiff's claim application that plaintiff could not work and he did not expect her to be able to return to work because "maximum medical improvement" had been achieved. Principal Life's initial decision denying short-term disability benefits was not "reasoned" in explaining how plaintiff's condition was compatible with her performing her "Own Job" as a charge nurse.

In September 2014, plaintiff appealed the denial of short-term disability benefits. After receiving more information from her treating physician, Dr. Baum, and obtaining a file review from a specialist in Occupational Medicine, Dr. Frank Polanco,[4] Principal Life denied the appeal on December 2, 2014. Despite the fact that plaintiff was appealing the denial of short-term benefits, which requires that she not be able to perform her "Own Job" as a charge nurse, Dr. Polanco's report concluded that plaintiff is "capable of performing sedentary work." He did not opine on plaintiff's ability to do "heavy" work in her job as a charge nurse, such as frequent walking and standing, and the ability to lift patients. Dr. Polanco's File Review Report dated Nov. 12, 2014 at 3. Principal Life also indicated it reviewed a list of restrictions Dr. Baum provided that included standing no more than 15 minutes per hour and lifting no more than 5 pounds. It also stated that plaintiff is "unable to be exposed to sick patients due to her diagnosis of CLL."

The denial letter states: (1) "there is nothing from the diagnosis of CLL that would preclude you from working," (2) "[T]here are no findings that would preclude you from full-time work. No restrictions are supported."; and (3) "This review concluded that medical documentation does not support impairment from working full-time." Dec. 2, 2014, Denial letter at 1, 2. The letter fails to mention anywhere what exertional level of full-time work plaintiff can maintain, and there is no discussion of the actual duties of her job as a charge nurse or acknowledgment that Principal Life had previously labeled it as "heavy" work. There is no discussion of why it rejected Dr. Baum's list of specific restrictions despite the fact that Principal Life had requested them in September 2014, and no discussion of how a charge nurse with a job classified as "heavy" could follow the listed restrictions as to both the exertional level and the exposure to infected persons. The failure

---

[4] Principal Life indicates that it relied on the file-only review because plaintiff refused to schedule an appointment for an independent medical evaluation with an occupational specialist to assess her functionality. Plaintiff maintains that she agreed to the evaluation at first, but subsequently refused to go when she began to believe that Principal Life was stalling in giving her an answer on her appeal of her denial of short-term benefits.

to analyze plaintiff's claim relative to her specific job as a charge nurse does not present a "reasoned" explanation for the denial. On remand, Principal Life must reevaluate plaintiff's claim for short-term disability benefits, taking into consideration the requirements of plaintiff's "Own Job," as well as the restrictions imposed by Dr. Baum.

### b. Long-term disability

Under the terms of the plan, an employee will be considered "Disabled" and qualify for long-term disability benefits if "solely and directly because of sickness, injury, or pregnancy . . . [d]uring the Elimination Period [first 90 days employee is unable to work] and the Own Occupation Period . . . [the employee] cannot perform the majority of the Substantial and Material Duties of your Own Occupation." Your "Own Occupation" is defined as "[t]he occupation the [employee] is routinely performing when Disability begins. The occupation of the [employee] as it is performed in the national economy when Disability begins. Own Occupation does not mean the specific tasks or job the [employee] is performing for the Policyholder or a Participating Unit or at a specific location." The "Own Occupation Period" is defined as "[t]he first two year(s) of the Benefit Payment Period."

Sheila Thompson, a vocational consultant for Principal Life, concluded that plaintiff's "Own Occupation" is as a licensed practical nurse, which is classified as a "medium strength" job. According to Principal Life's own "Occupational Analysis," medium-strength work requires "[e]xerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. The description of the duties of a licensed practical nurse include "[collect[ing] samples, such as urine, blood, and sputum, from patients for testing and performs routine laboratory tests on samples. . . . Bath[ing],

dress[ing], and assist[ing] patients in walking and turning. . . . Washes and dresses bodies of deceased persons."

The denial letter for plaintiff's application for long-term disability benefits was combined with the denial of her application for total disability benefits (Life Coverage During Disability). Letter from Principal Life dated Dec. 13, 2014. The letter states that plaintiff's claim was denied because she did not meet the definition of "Disability," and she did not have documentation to support that she was under the "Regular and Appropriate Care" of a physician.[5] The denial letter states that Principal Life relied on the same medical documentation received from treating physicians Dr. Ryan and Dr. Baum that it had relied on for plaintiff's appeal of the denial of short-term disability benefits on December 2, 2014. It also relied on the same file reviews it had relied on previously by Dr. Chao, an oncologist, and Dr. Polanco, an Occupational Medicine specialist. It also referenced phone calls and letters exchanged with plaintiff, as well as a "Supplemental information Form" and "Activities Check." Letter dated Dec. 13, 2014.

The definitions of "Disability" to qualify for long-term benefits or total disability benefits differ, and this difference was not clearly acknowledged or explained in the denial letter. To qualify for long-term disability benefits, plaintiff must demonstrate that she cannot perform her "Own Occupation." For purposes of claims for total disability, a claimant must demonstrate that she cannot perform "any" job. The denial of plaintiff's claim for long-term disability benefits

_____

[5] Regular and Appropriate Care of a Physician is defined as follows:

    [An employee] will be considered to be receiving Regular and Appropriate Care if he or she:

a.     is evaluated in person by a Physician; and

b.    receives treatment appropriate for the condition causing the Disability; and

c.    undergoes evaluations and treatment that is provided by a Physician whose specialty is appropriate for the condition causing the Disability; and

d.    undergoes evaluations and treatment at a frequency intended to return the [employee] to full-time work; and

e.    pursues reasonable treatment options or recommendations to achieve maximum medical improvement.

suffers from the same shortcomings as the denial of short-term benefits discussed above. There is no discussion or analysis that acknowledges the duties of plaintiff's "Own Occupation" as a licensed practical nurse, a profession requiring "medium" exertional strength. Dr. Polanco's review mentioned only "sedentary" work. While evidence that the plaintiff is capable of sedentary work may preclude her from claiming disability under the "Any Occupation" standard articulated in the plan for total disability benefits, it does not preclude the plaintiff from receiving disability benefits under the "Own Occupation" standard because the job of a licensed practical nurse requires more than the ability to sit, walk, stand, and type, as acknowledged by Principal Life in its own Occupational Analysis. Principal Life does not explain why it disregarded Dr. Baum's restrictions on plaintiff's exertional level, which limit plaintiff's activities to a level well below that required under the job description for a licensed practical nurse. In addition, there is no discussion of why Dr. Baum's restrictions on plaintiff's exposure to persons with infection and disease due to her compromised immune system were ignored when exposure to infections and pathogens occurs in the normal course of the work day for a licensed practical nurse ("[collect[ing] samples, such as urine, blood, and sputum, from patients for testing and performs routine laboratory tests on samples.").

The December 13, 2014, denial of long-term benefits also states that plaintiff's claim was denied because "we do not have documentation to support that you were under the Regular and Appropriate Care of a Physician." Principal Life's denial letter offers scant support for this reason to form the basis of the denial of long-term benefits.[6] Plaintiff adhered to the treatment plans of

---

[6] Principal Life points out that plaintiff refused to undergo an independent medical evaluation in the fall of 2014 that would have, in part, provided information about plaintiff's functionality. Plaintiff contends that she originally agreed to the evaluation, but when the exam was not scheduled within the 45-day period for Principal Life to render a decision on her long-term disability claim and her short-term disability appeal, she refused to schedule the appointment because she believed Principal Life was looking for an excuse to take an additional 45 days to make its decision. She argues that Principal Life should have known earlier in the process if it needed such an examination and not waited until the decision deadline to request it.

her treating physicians Dr. Ryan and Dr. Baum. Neither treating physician thought that treatment of plaintiff's chronic lymphocytic leukemia was necessary in the months following her diagnosis, which is not outside the norm for the early stages of the disease. As the name indicates, the disease is chronic and generally worsens over time, and treatment such as chemotherapy is sometimes used in latter stages of the disease. Although Dr. Ryan told plaintiff to return to see her in six months, plaintiff could not afford to return to Dr. Ryan, a specialist, but she saw Dr. Baum instead. Dr. Baum's notes do not indicate a strict schedule of follow-up visits, instead telling plaintiff to see him on an as-needed basis. On January 28, 2014, he told plaintiff to return in four months and she returned on May 28, 2014, exactly four months later. Blood work was performed at each of her visits. Plaintiff moved from Maine to Kentucky in July 2014 and applied for Medicaid. She stated she had difficulty finding doctors who would accept Medicaid, but she started seeing treating physician Dr. Schell, a specialist in hematology and oncology, on November 12, 2014, less than six months after her last visit with Dr. Baum. Principal Life has not demonstrated that plaintiff failed to follow the treatment plans of her treating physicians, or that she failed to attend appointments as directed by her treating physicians.

Plaintiff appealed Principal Life's denial of long-term and total disability benefits. On February 24, 2015, Principal Life sent plaintiff a letter denying short-term, long-term and total disability benefits on the sole ground that plaintiff did not meet the definition of "Disabled." Reliance on plaintiff's alleged lack of "Regular and Appropriate Care" is not mentioned. In addition to referencing all of its three earlier denial letters, the letter states that it also relied on medical records from plaintiff's treating physicians Dr. Schell and Dr. Donaldson, a file review by a psychiatrist, Dr. Antrin, and a file review by Dr. Chedid, an internist specializing in oncology and hematology. This denial letter stated in its conclusion that "[w]ith all the information in the

review and claim file, it shows you do not have limitations that would impact your functioning; thus you would be able to perform the Majority of the Substantial and Material Duties of your Own Job and your Own Occupation on a normal and consistent basis."

Dr. Chedid, an oncologist who conducted a file review on February 11, 2015, answered specific questions from Principal Life as to whether plaintiff could perform her "heavy" job as a charge nurse, or her "medium" job as a licensed practical nurse. He opined in response to both questions:

> From an oncology standpoint, there is no evidence to support the claimants' diagnosis of chronic lymphocytic leukemia as a cause of functional impairment, or restrictions and limitations. There was no indication that the claimant's diagnosis of chronic lymphocytic leukemia would prevent her from working. A stage 0, per the ECOG Performance Status, indicates the claimant should be fully active and able to carry on all pre-disease performance without restrictions.

File review of Dr. Silwan Chedid at 3. Dr. Chedid also listed Dr. Baum's exertional restrictions, but he did not offer any explanation as to why they should be disregarded, except to repeat that plaintiff is at stage 0 of the disease. Dr. Chedid does not discuss plaintiff's specific job duties at Continuum or the duties performed by most licensed practical nurses. While Principal Life need not give greater weight to a treating physician's opinion, *Black &Decker Disability Plan v. Nord*, 538 U.S. 822, 830-32 (2003), the fact that it apparently gave greater weight to Dr. Chedid's opinion than to Dr. Baum's without explanation lends force to the conclusion that it acted arbitrarily and capriciously. *See Elliott v. MetLife Ins. Co.*, 473 F.3d 613, 620-21 (6th Cir. 2006). It is also true that plan administrators "may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006).

The final denial letter merely recites medical terminology and the results of plaintiff's bloodwork without any reasoning as to why the diagnosis of chronic lymphocytic leukemia with symptoms of fatigue and weakness would permit her to function in a physically demanding

workplace. Principal Life's repeated reliance on *only* objective evidence from plaintiff's medical records to deny benefits is problematic in this case. We are troubled by the fact that there is so little evidence of a process anywhere in the administrative record—either by Principal Life or by the physicians it hired to review plaintiff's file—that relates plaintiff's condition to her expected job duties. Principal Life failed properly to consider the strength level needed for plaintiff to fulfill her duties as a charge nurse and as a licensed practical nurse, disregarded the opinions of her treating physicians without explanation, and then offered conclusory and unsupported or erroneous statements about plaintiff's functional capacity based only on file reviewers that either ignored or did not have the necessary information about plaintiff's "Own Job" and "Own Occupation." Principal Life's apparent reliance on these file-review reports to uphold its denial of plaintiff's claim was not reasonable in this case, and we conclude that the denial of plaintiff's disability claims and subsequent appeals was arbitrary and capricious.

Remand is necessary because Principal Life failed in at least two stages of its benefits determination to account adequately for plaintiff's *actual* job duties.[7] Our precedent on this point is clear: a plan administrator "could have made a reasoned judgment [that plaintiff could perform her occupation] only if it relied on medical evidence that assessed [plaintiff's] physical [and psychiatric] ability to perform job-related tasks." *Elliott*, 473 F.3d at 618. "Put differently, medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability." *Id*. "[M]erely recount[ing] the technical contents of [a claimant's] various [lab results

---

[7] If a court concludes that an administrator acted arbitrarily and capriciously, it may either remand the case to the administrator for a new review or award benefits to the beneficiary. *Elliott*, 473 F.3d at 621–22. Remand to the plan administrator is appropriate "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Id*. at 622 (brackets and quotation marks omitted). We will not remand for additional consideration if we believe plaintiff has clearly established that she is disabled under the plan. *See Kalish v. Liberty Mut./Liberty Life Assur. Co.*, 419 F.3d 501, 513 (6th Cir. 2005) (concluding that the appropriate remedy was an immediate award of benefits rather than a remand to allow the plan administrator to consider evidence that it had previously ignored).

and] medical evaluations," without "reason[ing] from [the claimant's] condition to her ability to perform her occupation" is not enough. *Id.* at 618–19. The reviewing physicians failed to consider in any reasoned manner whether the nature of plaintiff's job as a licensed practical nurse and charge nurse rendered her unable to do that work, in light of the identified duties for each classification. It is not clear whether all the reviewers had access to plaintiff's job duties or the normal duties of a licensed practical nurse when reviewing her file during the various benefits determinations. None of the reviewers critically assessed plaintiff's specific health issue, with its attendant fatigue and low resistance to infection, against the actual demands of her job and the profession.

## Conclusion

Principal Life failed squarely to address whether plaintiff's persistent symptom of fatigue and weakness, common with a chronic lymphocytic leukemia diagnosis, were compatible or incompatible with plaintiff's ability to perform the essential duties of her job as a licensed practical nurse. The fact that plaintiff might be able to perform a sedentary job that would allow her to sit most of the time does not mean that plaintiff could perform a job that requires the frequency of standing, walking and lifting listed in her own job description and in the occupational listing for a licensed practical nurse. Both descriptions include duties that exceed the strength needed for typical "sedentary" positions.

Even when it is reviewed under the deferential standard applicable in this case, we conclude that Principal Life's determination to deny benefits to plaintiff cannot be sustained. For the reasons set out above, we conclude that Principal Life's decision to deny short-term and long-term benefits in this case was not the product of a principled and deliberative reasoning process. In denying benefits, it relied solely on lab reports, ignoring her treating physicians' repeated opinions that

plaintiff could not keep up with the demands of working as a nurse. We therefore remand the case to Principal Life for further proceedings consistent with this opinion.

LARSEN, Circuit Judge, dissenting. I agree with the majority that the arbitrary-and-capricious standard of review applies in this case. In my view, however, application of that standard requires us to affirm the district court. Arbitrary-and-capricious review is the "least demanding form of judicial review." *Donati v. Ford Motor Co., Gen. Ret. Plan, Ret. Comm.*, 821 F.3d 667, 671 (6th Cir. 2016) (quoting *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014)). It requires us to extend "extreme deference" to Principal Life's decision to deny Card's application for benefits. *McClain*, 740 F.3d at 1067. "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* at 1065 (quoting *Shields v. Reader's Digest Ass'n*, 331 F.3d 536, 541 (6th Cir. 2003)).

ERISA does not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). In rejecting the opinion of a treating physician, a plan administrator need only offer "reasons for adopting an alternative opinion" for its decision to survive arbitrary-and-capricious review. *Shaw v. AT&T Benefit Plan No. 1*, 795 F.3d 538, 549 (6th Cir. 2015). Principal Life rejected the opinions of Card's treating physicians based on the opinions of four specialist physicians, who concluded that the objective medical evidence in Card's file did not support any restrictions on her ability to work. These physicians noted that Card was diagnosed with CLL with an ECOG performance status of zero. An ECOG performance status of zero indicates a patient is "[f]ully active, able to carry on all pre-disease performance without restriction." *ECOG Performance Status*, ECOG-ACRIN Cancer Res. Group, https://ecog-acrin.org/resources/ecog-performance-status (last visited Oct. 23, 2019) (cited in Appellant Br. at 21 n.6). The physicians further concluded that none of Card's subsequent laboratory reports or clinical findings indicated

that her CLL had worsened. A "reasonable mind" could therefore conclude, as Principal Life did in its final denial letter, that Card's medical documentation did not support the limitations indicated by her treating physicians. *See Dupont Dow Elastomers, LLC v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002) (defining "substantial evidence" under arbitrary-and-capricious review as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). I therefore disagree with the majority that Principal Life rejected the opinions of Card's treating physicians "without explanation."

The majority also makes much of the fact that Principal Life never discussed Card's job requirements in detail, but this is not an absolute requirement for surviving arbitrary-and-capricious review. Under this standard, we examine only whether Principal Life's decision "results from a deliberate principled reasoning process and is supported by substantial evidence." *McClain*, 740 F.3d at 1064–65 (quoting *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010)). In other words, did Principal Life articulate "a rational connection between the facts found and the choice made"? *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (quoting *GTE Midwest, Inc. v. FCC*, 233 F.3d 341, 345 (6th Cir. 2000)). If Principal Life had found that Card's CLL in some way limited her functions, the majority would be right that Principal Life would then have to look to Card's actual duties to see whether she could still perform them. But Principal Life reasonably concluded from the objective medical evidence that Card's condition did not place any limitations on her at all. From this, Principal Life could reasonably infer that Card was not disabled, because however demanding Card's job duties were, her CLL could not have prevented her from performing them. This logical conclusion drawn from premises supported by substantial evidence is all that the arbitrary-and-capricious standard demands of a plan administrator.

Lastly, the majority makes the puzzling claim that it was "problematic" for Principal Life to rely "on *only* objective evidence from plaintiff's medical records to deny benefits." Under the plan terms, however, Card bears the burden of establishing that she is disabled. We have previously noted that "subjective complaints of fatigue . . . are easy to make, but almost impossible to refute." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996) (internal record citation omitted). I therefore disagree that *no* reasonable mind could conclude that a claimant has failed to prove she is disabled when the objective medical evidence from her record does not support her subjective claims of fatigue. *See id.* ("In the absence of any definite anatomic explanation of plaintiff's symptoms, we cannot find that the administrator's decision to deny benefits was arbitrary and capricious.").

Principal Life based its denial of Card's claims on four specialist physicians' analyses of the evidence in her medical records. We must apply "extreme deference" to its decision because the plan grants discretion to Principal Life to interpret its terms. *McClain*, 740 F.3d at 1064. Since I cannot say that it is "[im]possible to offer a reasoned explanation, based on the evidence, for [this] particular outcome," *id.* at 1065 (quoting *Shields*, 331 F.3d at 541), I respectfully dissent. I would AFFIRM the district court's grant of summary judgment to Principal Life.